OPINION OF THE COURT
 

 STAPLETON, Circuit Judge:
 

 This appeal requires us to consider the extent to which the presumption against setoffs in Section 77 railroad reorganizations, articulated in
 
 Baker v. Gold Seal Liquors,
 
 417 U.S. 467, 94 S.Ct. 2504, 41 L.Ed.2d 243 (1974), is applicable to cases brought under the Regional Rail Reorganization Act of 1973, 45 U.S.C. § 701
 
 et seq.
 
 (1982 & Supp. IV) (“Rail Act”). The district court concluded that the presumption does apply, but that countervailing eq
 
 *687
 
 uitable considerations in this particular Rail Act reorganization rendered appropriate a setoff of obligations between the debtor and another reorganized railroad. We hold that the presumption against setoffs in reorganizations under Section 77 is applicable, and that the countervailing concerns in this case do not overcome the presumption. Accordingly, we will reverse.
 

 I.
 

 Both parties, appellant CJI Industries, Inc. (CJI) and appellee Reading Company (Reading), were reorganized pursuant to the Rail Act, 45 U.S.C. § 701
 
 et seq.,
 
 after having conveyed their assets to Conrail. CJI emerged from reorganization proceedings involving the Central Railroad Company of New Jersey (CNJ), which filed for reorganization on March 23, 1967 and was finally reorganized on September 13, 1979. Reading entered reorganization on November 23, 1971, beginning a process which lasted nearly as long.
 

 The interactions of the two companies relevant to this appeal date to early 1978, when Reading decided to accept, in exchange for its claims in the CNJ reorganization, the terms of a settlement designed to facilitate consolidation and satisfaction of Reading’s and other railroads’ outstanding interline claims against CNJ. The settlement, which CNJ entered into with the Committee of Interline Railroads, proposed a three part disposition of the claims of each railroad that agreed to it. The first part, comprising 35% of the claims, would be paid in cash. The second portion, 25%, would be treated as ordinary administration claims; the final 40% would be considered general, pre-reorganization unsecured debt.
 

 Reading’s unsecured claims were found to total $466,428.35. CNJ’s reorganization plan proposed that these claims, and the claims of CNJ’s other unsecured creditors, be tied to litigation pending against the United States government. The litigation, CNJ’s Valuation Case, was a dispute concerning the value of the assets CNJ had transferred to Conrail in connection with the reorganization proceedings. According to CNJ’s proposal, the proceeds realized from the Valuation Case would be placed in a trust, to be distributed to CNJ’s creditors based on their respective priorities. Reading’s potential interest would be embodied in “Series I notes,” which were to be inferi- or in priority to those of several other classes of creditors. Reading would receive compensation only after higher priority creditors had been paid in full.
 

 The district court supervising CNJ’s reorganization confirmed CNJ’s plan.
 
 See Matter of Central Railroad Co. of New Jersey,
 
 473 F.Supp. 225 (D.N.J.1979) (approving the plan after appeal to the Court of Appeals). Accordingly, Reading was given its Series I notes and CNJ’s other creditors were provided for similarly, which left CNJ, as stated in Order 965:
 

 free and clear of all claims, rights, demands, interests, liens and encumbrances of every kind and character, whether or not properly or timely filed and whether or not approved, acknowledged or allowed in these proceedings.
 

 App. at 93. The district court’s orders suggested that Reading’s sole remaining recourse was against the proceeds of Valuation Case.
 

 Reading’s own reorganization plan took effect on January 1, 1981. According to the plan, each unsecured creditor was entitled to an interest-bearing unsecured note covering its claim. CJI held claims against Reading totalling $497,945.52. When CJI attempted to obtain a note in the amount it was owed, Reading raised the issue of set-off for the first time. Reading argued that it was entitled to set off the notes it had received in the CNJ reorganization, whose face value, as noted above, was $466,-428.35, against CJI’s $497,942.52 unsecured claim. CJI objected to this strategic use of the Series I notes.
 

 Reading and CJI met several times in early 1981 in an effort to resolve their differences. At one point, senior officers of the two companies had reached a tentative agreement with respect to their claims against one another. Reading’s Board of Directors forwarded the agreement to the Reading Executive Committee, which ap
 
 *688
 
 parently gave one of Reading’s directors, Joe Castle, informal notice that the committee approved the proposal. Reading’s Executive Committee failed to take further action, however, and a letter and copy of the agreement sent by Reading to CJI’s president, Robert Timpany, were not responded to. The negotiations were not further pursued.
 

 Subsequently dissatisfied with the state of affairs, CJI petitioned the district court for an order directing Reading to issue unsecured notes for the entire $497,945.52 owed it by Reading. The court held a hearing to consider CJI’s petition. CJI’s position at the hearing was that the Supreme Court’s decision in
 
 Baker v. Gold Seal Liquors,
 
 417 U.S. 467, 94 S.Ct. 2504, 41 L.Ed.2d 243 (1974), precluded Reading from effecting a setoff. CJI argued that:
 

 it is fairly clear, after the Supreme Court ruled in
 
 Baker
 
 and from Justice Stewart’s concurring opinion in terms of his understanding of what they were saying, that setoffs are just not acceptable in a 77 context.
 

 App. at 171-172. Reading sought to distinguish
 
 Baker
 
 and to demonstrate that Reading’s reorganization, by its terms, mandated setoff.
 

 The district court agreed with Reading. While conceding that
 
 Baker
 
 generally disapproves setoffs in railroad reorganizations under Section 77 of the Bankruptcy Act, 11 U.S.C. § 205 (1970), the court concluded that
 
 Baker
 
 did not establish an absolute prohibition of setoffs. App. at 196. The court deemed it necessary to conduct an inquiry into equitable considerations. It noted the fact that neither Reading nor CJI existed any longer as functioning railroads, and expressed the view that it would be unfair if CJI were permitted to preserve its full unsecured claim in the Reading reorganization, which promised a possible 100% return, while Reading was left saddled with $466,428.35 in CJI notes of indeterminate value. The court ultimately concluded that Reading’s $466,428.35 should cancel a like portion of CJI’s unsecured claim, and that Reading need only issue unsecured notes for the remaining $31,-517.17.
 

 On appeal, CJI argues that the district court misapplied
 
 Baker.
 
 CJI contends that
 
 Baker
 
 prohibits setoff under any circumstances. Alternatively, CJI insists that even if setoff still may be appropriate in extraordinary circumstances, the district court abused its discretion by allowing set-off in this case. We agree with the latter contention. In light of the authorization found in § 601(b)(4) of the Rail Act, 45 U.S.C. § 791(b)(4), for a reorganization under the Rail Act to proceed as if it were a reorganization under Section 77, we conclude that
 
 Baker
 
 is controlling in this context, and that the Supreme Court’s decision requires us to prohibit setoff in this case.
 
 [1]
 

 II.
 

 The Supreme Court’s decision in
 
 Baker v. Gold Seal Liquors,
 
 417 U.S. 467, 94 S.Ct. 2504, 41 L.Ed.2d 243 (1974), made clear that setoffs are generally not allowed in railroad reorganizations.
 
 Baker
 
 involved an appeal from a district court’s decision to allow a setoff requested by a shipper seeking to offset cargo loss and damage claims against freight charges claimed by a railroad’s trustees. After the Court of Appeals affirmed the district court’s ruling, the Supreme Court reversed. The Court described the procedure in ordinary bankruptcy cases, where setoff is routinely allowed
 
 [2]
 
 and arguably may be compulsory in some instances.
 
 [3]
 
 The Court con-
 
 *689
 
 eluded, however, that Section 77 cases must be viewed differently, because reorganization is the focus of Section 77, whereas ordinary bankruptcy cases typically result in liquidation.
 
 [4]
 
 The court noted that the emphasis on reorganization in Section 77:
 

 entails two basic considerations. First, is the collection of amounts owed the bankrupt to keep its cash inflow sufficient for operating purposes ... The second is to design a plan ... which will meet the fair-and-equitable standards required by the Act for Court approval.
 

 417 U.S. at 470-71, 94 S.Ct. at 2507.
 

 With respect to the second concern, the Court pointed out that the:
 

 guiding principle governing priorities is stated in § 77e(Z), 11 U.S.C. § 205(e)(1): the Reorganization Court shall approve a plan if it “is fair and equitable, affords due recognition to the rights of each class of creditors and stockholders, does not discriminate unfairly in favor of any class of creditors or stockholders, and will conform to the requirements of the law of the land regarding the participation of the various classes of creditors and stockholders.”
 

 417 U.S. at 473, 94 S.Ct. at 2508. Setoffs were seen by the Court as conflicting with this principle because they afford affected creditors different treatment than that received by creditors, otherwise similarly situated, who have no offsetting claim on which to base a setoff.
 
 [5]
 
 In the
 
 Baker
 
 situation, for example, the Court noted that the setoff permitted by the Reorganization Court “grants a preference to the claim of one [unsecured creditor] over the others by the happenstance that is owes freight charges that the others do not.” 417 U.S. at 474, 94 S.Ct. at 2508-09. This, the Court concluded, “is a form of discrimination to which the policy of § 77 is opposed.” The Court held that “[a]s a general rule of administration for § 77 Reorganization Courts, the setoff should not be allowed.” 417 U.S. at 474, 94 S.Ct. at 2509. The Court’s holding has been read as establishing a strong anti-setoff policy.
 
 See, e.g., Matter of Penn Central Transportation Co.,
 
 458 F.Supp. 1234, 1330 (E.D.Pa.1978) (setoff not appropriate in Section 77 cases except perhaps in truly extraordinary circumstances such as lender fraud).
 

 Reading attempts to distinguish the circumstances under which
 
 Baker
 
 was decided from those of the present case. Reading points out that, while
 
 Baker
 
 arose in the context of an ordinary Section 77 reorganization, both Reading and CJI have reorganized pursuant to the Rail Act, which governs reorganization of railroads that have conveyed their assets to Conrail. Section 77 proceedings usually result in a reorganized, ongoing railroad. Rail Act reorganizations, on the other hand, often reorganize companies that, having sold their operating assets to Conrail, no longer consist of ongoing businesses.
 
 [6]
 
 Thus, Rail Act reorganizations arguably constitute a unique form of railroad reorganization. Reading would have us conclude from this that
 
 Baker,
 
 because it arose under Section 77 rather than the Rail Act, is of no moment in Rail Act contexts.
 

 While
 
 Baker
 
 does attach significance to the focus on reorganization in Section 77, we cannot accept Reading’s argument that the absence of an ongoing underlying business renders
 
 Baker
 
 inapplicable. Section
 
 *690
 
 601(b)(4) of the Rail Act, 45 U.S.C. § 791(b)(4), expressly directs that the reorganization court:
 

 shall proceed to
 
 reorganize or liquidate [the] railroad in reorganization pursuant to ... Section 77 on such terms as the court deems just and reasonable,
 
 or pursuant to any other provisions of the Bankruptcy Act ... (emphasis supplied).
 

 Section 601(b)(4) makes clear that Section 77, and caselaw decided under that section, continues to apply in the context of a Rail Act proceeding, despite the absence of an ongoing business. As we pointed out in
 
 Matter of Lehigh Valley Railroad Co.,
 
 558 F.2d 137 (3d Cir.1977), “ ‘[Section] 77 ... continues in effect except where specifically contradicted by the Rail Act.’ ” 558 F.2d at 141, quoting Blatchly,
 
 Railroad Reorganization Under the Regional Rail Reorganization Act of 1973: An Overview,
 
 40 Albany L.Rev. 812, 828 (1976).
 
 See also Matter of Central Railroad Co. of New Jersey,
 
 425 F.Supp. 1055, 1058 (D.N.J.1976) (“[The Rail Act] supplements but does not displace Section 77.”); 5
 
 Collier on Bankruptcy
 
 if 77.01[5] (14th ed. 1978).
 

 In adopting the Rail Act, and § 601(b)(4) in particular, Congress was cognizant that Railroad Act cases would involve the reorganization of railroads no longer maintaining an ongoing business.
 
 See Matter of Lehigh Valley Railroad Co.,
 
 558 F.2d 137, 142 (3d Cir.1977) (“Congress must have been aware, when it enacted [§ 601(b)(4) ], that none of the railroad estates would actually be operating trains any longer.”). Section 601(b)(4) suggests that, although Congress was mindful of the relevance of railroads’ cessation of operations, it concluded that the railroads still should be permitted to reorganize as if they were ongoing railroads.
 
 See also Lehigh Valley,
 
 558 F.2d at 146 (The case law provides “persuasive support for the proposition that the reorganization of a railroad may properly continue under Section 77 despite the fact that the enterprise is no longer capable of being reorganized into a working railroad.”). To adopt Reading’s suggestion that the absence of an ongoing business by itself renders
 
 Baker
 
 inapplicable would be to ignore Congress’s clear intention that Rail Act cases be treated as Section 77 cases are. We decline to take this step.
 

 Reading also argues that
 
 Baker,
 
 even if applicable, does not preclude setoff in all cases. Reading relies for this proposition upon a footnote to the final sentence of the
 
 Baker
 
 decision. The footnote asserts that:
 

 Lowden v. Northwestern National Bank & Trust Co.,
 
 298 U.S. 160 [56 S.Ct. 696, 80 L.Ed. 1114 (1936) ] is not to the contrary.... The preference sought here shows no exceptional circumstances which in equity justify the discrimination.
 

 417 U.S. at 474 & n. 13, 94 S.Ct. at 2509, n. 13 at 2509.
 
 Lowden
 
 involved the same issue as
 
 Baker,
 
 whether setoff is appropriate in Section 77 proceedings. The Supreme Court, while declining to reach the issue because the questions that had been certified were worded too abstractly, did suggest that courts should address the set-off question on a case-by-case basis.
 
 See
 
 298 U.S. at 166, 56 S.Ct. at 699. Because the
 
 Baker
 
 opinion asserts explicitly that it is consistent with
 
 Lowden,
 
 Reading insists,
 
 Baker
 
 too invites an inquiry into equitable considerations.
 

 CJI urges us to reject this reasoning and argues that the presumption against set-offs announced in
 
 Baker
 
 amounts to an absolute prohibition. Although the Court’s holding in
 
 Baker
 
 is strongly worded and, particularly when contrasted with the concurrence, suggests broad applicability, we decline the invitation to so hold in this case. Where there is evidence suggesting that a creditor’s circumstances are fundamentally different from those of the other creditors in its class, setoff may well be appropriate.
 
 See, e.g., Matter of Penn Central Transportation Co.,
 
 458 F.Supp. 1234, 1330 (E.D.Pa.1978) (Suggesting that a debtor’s failure to invoke pre-bankruptcy setoff rights due to fraudulent representations made by the debtor might qualify as a circumstance exceptional enough to warrant post-petition setoff). On the facts of this case, however, we need not determine
 
 Baker’s
 
 precise scope.
 

 
 *691
 
 It is enough to find that Reading simply has not demonstrated the existence of equitable considerations compelling enough to necessitate further inquiry. Reading’s arguments in support of setoff distill to two, the absence of an ongoing company to be reorganized and the fact that a debtor rather than an unsecured creditor sought the setoff. As discussed above, § 601(b)(4) undercuts Reading’s contention that Section 77 guidelines are inappropriate solely because the Reading and CNJ reorganizations do not involve ongoing railroads.
 

 Reading’s suggestion that the applicability of the presumption against setoffs varies depending on which party invokes it is no more persuasive. Nowhere in the
 
 Baker
 
 opinion is there evidence that the Court contemplated a distinction based upon which party requested setoff. Moreover, the Supreme Court’s concern in
 
 Baker
 
 that setoff would violate the fair-and-equitable requirement, 417 U.S. at 473-74, 94 S.Ct. at 2508, is fully applicable here. To permit Reading to effect a setoff would be to treat CJI less favorably than Reading’s other unsecured creditors. Whereas the other creditors would receive unsecured notes likely to be paid in full, CJI’s claim would be largely eliminated by Series I notes of indeterminate value.
 
 Baker
 
 specifically disapproved fortuitous discrimination between creditors of the same class and we see no administrative or other advantage significant enough to justify our sanctioning such discrimination. Accordingly, we conclude, as
 
 Baker
 
 suggests we must, that Reading should not be permitted to reduce its obligation to CNJ through setoff.
 

 Reading also argues that Reading Reorganization Court Order 2004 mandates set-off. Order 2004 provides, in part, that:
 

 [A]ny such ... creditor against whom the Debtor has a pre-bankruptcy claim which has not ... been satisfied ... shall pay such claim[] in cash.
 

 App. at 75. On its face, this language does not appear to address the question of set-off. If anything, the order, by requiring satisfaction in cash of the debtor’s claims against its creditors, appears to preclude setoff. We need not engage in conjecture as to the order’s intended effect, however. Even if it were a provision for setoff, as Reading argues, Order 2004 would clearly be inconsistent with
 
 Baker,
 
 and could not be effectuated. Thus, it cannot under any interpretation provide support for Reading’s position.
 

 III.
 

 For the foregoing reasons, the order of the district court will be reversed and the case will be remanded for further proceedings consistent with this opinion.
 

 [1]
 

 .Our holding makes it unnecessary to address several arguments advanced by CJI as alternatives to reliance on
 
 Baker,
 
 such as CJI’s contention that mutuality of debts, a prerequisite to setoff, did not exist because CJI was in reality no longer indebted to Reading; nor need we determine the validity of CJI's contention that the orders of its reorganization court constitute final judgments that preclude, through res judi-cata, Reading’s subsequent assertion of setoff rights in the Reading reorganization.
 

 [2]
 

 .
 
 See Baker,
 
 417 U.S. at 469, 94 S.Ct. at 2506. Section 68 of the old Act, 11 U.S.C. § 108, now found (as amended) in § 553, explicitly provided for setoffs.
 

 [3]
 

 . F.R.C.P.Rule 13(a) may require setoff where the potential setoff arises from a cause of action
 
 *689
 
 related to a claim raised by the party against which the setoff would be effected.
 

 [4]
 

 .See, e.g.,
 
 5
 
 Collier on Bankruptcy
 
 ¶ 77.10 (14th ed. 1978).
 
 Collier
 
 suggests that although §
 
 77(1)
 
 describes ordinary bankruptcy provisions as generally applicable to Section 77 cases, these provisions are not always appropriate because "Chapter VIII as a whole is such a wide departure from the usual bankruptcy law and practice, and the purpose of the section is conservation and rehabilitation rather than liquidation."
 
 Id.
 

 [5]
 

 . While ordinary unsecured creditors are likely to receive only a fraction of their claims’ face values, an unsecured creditor who is allowed a setoff may receive what is in effect full payment, because he or she, through setoff, cancels debts owed the debtor.
 

 [6]
 

 . What remains following the asset sale is a skeleton company consisting primarily of proceeds from the sale. The company is essentially a trust holding funds belonging to its creditors, and its "reorganization" effects a liquidation.