852 F.2d 73
 Bankr. L. Rep. P 72,353
Stanley ZULKOWSKI, Sr. & Clara Ruth Zulkowski
v.
CONSOLIDATED RAIL CORP., Garlock, Inc., Certain-Teed
Corporation, Raymark Industries, Inc., a/k/a
Raybestos-Manhattan, Inc., the Celotex Corp., Armstrong
World Industries and Central Jersey Industries, Inc.
Appeal of CENTRAL JERSEY INDUSTRIES, INC.
 No. 88-5172.
 United States Court of Appeals,
Third Circuit.
 Argued June 9, 1988.
Decided July 19, 1988.
Rehearing and Rehearing In Banc Denied Aug. 11, 1988.
 
 Stanley Weiss, (argued), Carpenter, Bennett & Morrissey, Newark, N.J., for appellant.
 Ralph G. Wellington (argued), Margaret S. Woodruff, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellee Consol. Rail Corp.
 Paul T. Hofmann, Montvale, N.J., Stephen J. Kiely (argued), Thornton & Early, Boston, Mass., for appellees Stanley Zulkowski, Sr., and Clara Ruth Zulkowski.
 Before BECKER, STAPLETON, and GREENBERG, Circuit Judges.
 OPINION OF THE COURT
 GREENBERG, Circuit Judge.
 
 
 1
 On this appeal we determine whether a former railroad is absolved of liability from a claim by a former employee under the Federal Employers' Liability Act (FELA) for asbestosis becoming manifest subsequent to the reorganization of the railroad pursuant to section 77 of the Bankruptcy Act of 1898, as supplemented by the Regional Rail Reorganization Act of 1973 (Rail Act), and after the divestment of its rail assets by their conveyance to the Consolidated Rail Corporation (Conrail). We hold that it is not shielded from these claims.[1]
 
 I.
 
 2
 Plaintiff, Stanley Zulkowski, was employed by the Central Railroad Company of New Jersey (CNJ) from 1962 until 1976. Because of financial distress, CNJ was in reorganization from 1967 until 1979. In response to a major railroad financial crisis, leading to reorganization proceedings for several railroads, in 1973 Congress enacted the Rail Act, 45 U.S.C. Secs. 701-797. The Act recited that it was passed since "essential rail service [was] threatened with cessation or significant curtailment because of the inability of the trustees of such railroads to formulate acceptable plans of reorganization" and since "[t]he public convenience and necessity require adequate and efficient rail service ... to meet the needs of commerce, the national defense, the environment, and the service requirements of passengers, United States mail, shippers, States and their political subdivisions, and consumers." 45 U.S.C. Sec. 701(a)(2), (3). The Rail Act provided for the creation of Conrail and the conveyance to it of the rail assets held by railroads in reorganization. 45 U.S.C. Secs. 741, 743.[2] Accordingly, the rail assets of CNJ were conveyed to Conrail in 1976 with final values for the assets to be determined in statutory valuation proceedings. See In re Reading Co., 838 F.2d 686, 687 (3d Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 2825, 100 L.Ed.2d 925 (1988); In re Cent. R.R. Co. of N.J., 579 F.2d 804, 806-07 (3d Cir.1978). At that time Mr. Zulkowski became an employee of Conrail and he continued that employment until his retirement in 1979.
 
 
 3
 CNJ, which had been incorporated under a special act of the New Jersey Legislature, remained in reorganization until September 14, 1979, the "consummation date," when it filed a restated and amended certificate of incorporation under N.J.Stat.Ann. Sec. 14A:1-4 (West 1969) providing for a change of its name to Central Jersey Industries, Inc.[3] See also In re Cent. R.R. Co. of N.J., 473 F.Supp. 225 (D.N.J.1979). It was later renamed CJI Industries, Inc. and will therefore be referred to as CJI in this opinion. Under the plan of reorganization the secured creditors of CNJ became the shareholders of CJI. Except for the rail assets previously conveyed to Conrail, the assets of CNJ, including cash, real estate, investments, leases and certificates from the United States Railway Association guaranteeing payment for the CNJ rail assets conveyed to Conrail, remained the property of CJI after the consummation date. In addition, CJI retained substantial income tax loss carryforwards from CNJ's discontinued rail operations. Though no longer a railroad, CJI has continued in business and is a substantial entity. Its net income was over $5.8 million in 1985 and its stock is listed on the Philadelphia Stock Exchange.
 
 
 4
 Mr. Zulkowski and his wife, Clara Ruth Zulkowski, brought this FELA action on December 9, 1986 against Conrail and CJI as a result of his asbestosis which, though allegedly traceable to asbestos exposure during his employment with CNJ, was not manifested until after the consummation date.[4] CJI moved for summary judgment against the complaint and against all crossclaims on the ground that it is not the legal successor to CNJ. It later specifically moved for summary judgment on Conrail's cross-claim for indemnification on the ground that Conrail was the successor to CNJ.
 
 
 5
 The district judge, in ruling on the motions, noted that the thrust of CJI's position was that as a result of the reorganization CNJ's rail liabilities passed to Conrail. Thus, the judge perceived the issue before him to be "whether Congress intended in section 77 of the Bankruptcy Act and the Rail Act to pass the debtor's non-discharged rail obligations to Conrail." He answered this question in the negative, relying on this court's decision in Schweitzer v. Consolidated Rail Corp., 758 F.2d 936 (3d Cir.), cert. denied, 474 U.S. 864, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985), as well as the bankruptcy court's decision on remand from this court in Schweitzer v. Consolidated Rail Corp., 65 B.R. 794 (Bankr.E.D.Pa.1986). The judge reasoned that the effect of the reorganization was to discharge existing claims but not to shield CJI, as the reorganized company, from future claims which might relate to earlier activities. He also indicated that an examination of 45 U.S.C. Sec. 797h and 45 U.S.C. Sec. 721(h)(1)(A) suggested that Congress intended to absolve railroads from claims for certain personal injuries or death which existed at the time of reorganization but not claims which did not yet exist at that time. Thus, the judge denied CJI's motions for summary judgment. A single order was entered on February 11, 1988 on both motions.
 
 II.
 
 6
 This court has jurisdiction pursuant to 28 U.S.C. Sec. 1292(b). The district court certified the following question of law:
 
 
 7
 Whether Congress intended in Sec. 77 of the Bankruptcy Act, and the Regional Rail Reorganization Act (Rail Act), as amended, or other law that Consolidated Rail Corporation or the transferors reorganized under the Rail Act, or both, would succeed to the responsibility for FELA claims that were unmatured at the time of the conveyances; and whether the nature of the reorganization of The Central Railroad Company of New Jersey precludes any liability on behalf of CJI Industries, Inc. on such claims.
 
 
 8
 While we have granted permission to appeal, the question certified is broader than the issue resolved in the district court. Though the judge in considering CJI's motions did discuss Conrail's possible liability, he did so in the context of considering the liability of CJI. Thus, the precise matter before the district court on CJI's motions for summary judgment was not Conrail's responsibility for the Zulkowskis' claims. Rather, it was whether CJI could be liable. This distinction is critical as our jurisdiction is limited to a review of the order of the district court. Thus, though we acknowledge that, like the district court, we will make some reference to the potential liability of Conrail, inasmuch as the order of the district court did not determine whether Conrail could be liable for the Zulkowskis' claims neither will we. Accordingly, our opinion only passes on the possible liability of CJI. Miller v. Bolger, 802 F.2d 660, 666-67 (3d Cir.1986). See In re Data Access Sys. Sec. Litig., 843 F.2d 1537, 1550-51 (3d Cir.1988); Link v. Mercedes-Benz of N. Am., Inc., 550 F.2d 860, 863 (3d Cir.) (in banc), cert. denied, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977) ("[O]ur jurisdiction extends only to orders of the district court. These orders must be definitive, effective, and in a posture capable of affirmance or reversal.").
 
 III.
 
 9
 CJI asserts that it is released from liability to the Zulkowskis in accordance with Congressional intent implicit in the Rail Act with respect to latent asbestosis claims. Inasmuch as the Rail Act supplements section 77 of the Bankruptcy Act of 1898, 11 U.S.C. Sec. 205 (repealed 1978), we first consider the effect of section 77 in this case.[5] See Blanchette v. Connecticut Gen. Ins. Corps., 419 U.S. 102, 109, 95 S.Ct. 335, 342, 42 L.Ed.2d 320 (1974). Section 77(b) of the Bankruptcy Act provided that plans of reorganization "shall include provisions modifying or altering the rights of creditors...." 11 U.S.C. Sec. 205(b) (repealed 1978). Creditors include "all holders of claims of whatever character against the debtor or its property, whether or not such claims would constitute provable claims under [the Act]...." Ibid. Claims include "debts, whether liquidated or unliquidated ... or other interests of whatever character." Ibid.
 
 
 10
 In Schweitzer v. Consolidated Rail Corp., 758 F.2d 936, former employees of CJI and another reorganized railroad, The Reading Company, brought FELA actions against the reorganized companies for injuries manifested after the reorganizations but allegedly caused by exposure to asbestos before the reorganizations. The reorganized companies argued that the actions were barred by the discharges in their bankruptcy proceedings. Id. at 940.
 
 
 11
 In our analysis, we acknowledged that a tort action is a "claim" under section 77. 758 F.2d at 941. We recognized, however, that generally a tort action does not exist until a party suffers an identifiable, compensable injury. Id. at 942. Thus, we held that a subclinical injury from asbestos exposure is an insufficient basis on which to maintain a tort action as a party does not suffer an actual loss or damage from such an injury. Ibid. Accordingly, we held that manifest injury is a prerequisite for an FELA action for an asbestos-related injury. Inasmuch as the employees in Schweitzer did not have manifest injuries prior to the reorganization, their claims could not have been discharged under section 77. See id. at 944. It follows from Schweitzer that the Zulkowskis' claims were not discharged simply because CNJ went through reorganization.
 
 
 12
 But Schweitzer does not entirely resolve the issue before us for it is one thing to conclude that a claim has survived but another to identify the entity responsible for it. CJI asserts "the entire focus of the Rail Act is upon the creation of Conrail as the reorganized company." Thus, in its view, the liability for any claim which the Zulkowskis could have made against CNJ has passed to Conrail. In support of this position, CJI cites to portions of the Rail Act and subsequent legislative history. E.g., 45 U.S.C. Sec. 701(b)(2) (a purpose of Rail Act is "reorganization of railroads ... into an economically viable system...."); 45 U.S.C. Sec. 719(b) (creation of special court); 45 U.S.C. Sec. 743 (conveyances of rail properties to Conrail); 45 U.S.C. Sec. 791(b)(4) (reorganization courts should proceed justly, reasonably and in the best interests of the estate to reorganize or liquidate railroads in reorganization); H.R.Rep. No. 7, 94th Cong., 1st Sess. 4, reprinted in 1975 U.S.Code Cong. & Admin.News 35, 36 (the Rail Act "was designed to ... provide a means of reorganizing a number of rail carriers in the region into a profitable system.").
 
 
 13
 But nowhere in these citations, or elsewhere in the Rail Act, is there any provision transferring the liability for a claim of the type made here from an entity reorganized under the Act to Conrail or otherwise relieving an entity so reorganized from such a liability. In the absence of any such provision, we will hold consistently with Schweitzer that the liability will remain with CJI if the Zulkowskis' claim proves to be meritorious.
 
 
 14
 We also point out CJI's position cannot be reconciled with the actual application of the Act, CJI received certificates of value in the principal amount of $40,874,734 for the assets conveyed which were later redeemed for $91,786,087, the principal plus interest of $50,911,353. In return, the rail assets were conveyed to Conrail free and clear of any liens or encumbrances. 45 U.S.C. Sec. 743(b)(2). CJI does not suggest that it received an amount reduced from the value which would have otherwise been fixed for its rail assets because of the estimated value of the latent asbestosis claims, nor is there any indication that the allocation of rail assets to Conrail contemplated the transfer of liability for the latent asbestosis claims. Thus, the obligations represented by the certificates of value did not reflect a transfer of liability and the valuation proceeding will be skewed in CJI's favor if it is relieved of liability for these claims.[6] Relieving it of this liability would effectively give CJI an additional consideration and thus would be contrary to Congressional intent as CJI would be receiving more than the minimum compensation required by the Constitution which is what it was to receive under the Rail Act. See Blanchette v. Connecticut Gen. Ins. Corps., 419 U.S. at 148, 95 S.Ct. at 361.
 
 
 15
 While we decide this case on the basis of the application of section 77 and the Rail Act, we note that general corporation law is consistent with our result. CNJ did not become a new entity by amending its certificate of incorporation. 15 W. Fletcher, Cyclopedia of the Law of Private Corporations Sec. 7329 (rev. perm. ed. 1983). Thus, notwithstanding the name change, the liabilities of CNJ which survived the reorganization are the liabilities of CJI. See Polius v. Clark Equip. Co., 802 F.2d 75, 77 (3d Cir.1986); Knapp v. North Am. Rockwell Corp., 506 F.2d 361, 364 (3d Cir.1974), cert. denied, 421 U.S. 965, 95 S.Ct. 1955, 44 L.Ed.2d 452 (1975). See also Gee v. Tenneco, Inc., 615 F.2d 857, 862 (9th Cir.1980) ("We are aware of no rule of law which allows a corporate entity to evade liability for its tortious conduct merely by selling the ... instrumentality which is alleged to have caused the injury...."). Indeed, the New Jersey statute under which CNJ filed its amended certificate of incorporation provides that "[n]othing in this section shall be held to affect such transactions, liabilities or debts of any such corporations, occurring before the filing of such certificate." N.J.Stat.Ann. Sec. 14A:1-4 (West 1969). Further, CJI is not a new corporation with new outside shareholders. Rather, its shareholders had been secured creditors of CNJ. Overall, therefore, our result is consistent with general corporation law.[7]
 
 
 16
 It should not be overlooked that in other contexts CJI has acknowledged that it is the successor to CNJ. Following the consummation date, in a notice to its stockholders of a special meeting for December 13, 1979, CJI stated that it was "the successor through reorganization under Sec. 77 of the federal bankruptcy laws of The Central Railroad of New Jersey." The notice also read in part: "Since the consummation of the plan, the Company has continued to manage its retained assets...." Further, in a discussion of its net operating loss carryforwards the financial statement appended to the notice indicated that "Central Jersey Industries, under its former name of Central Railroad Company of New Jersey" filed certain tax returns. Clearly, by claiming the loss carryforwards CJI benefitted from CNJ's railroad losses at a time when CJI was engaged solely in other businesses. In the circumstances, we have difficulty understanding how CJI can now suggest that it should not be regarded as the successor to CNJ.
 
 
 17
 We also point out that CJI's position is inconsistent with the contentions it advanced in In re Reading Co., 838 F.2d 686. There it contended that the Reading Company, which reorganized under section 77, should not be allowed to set off the notes it received for its unsecured claims against CNJ in the latter's reorganization against claims which CJI held against Reading even though set offs are routinely allowed in ordinary bankruptcy cases. The claim of set off was significant as it appeared that the notes issued by CNJ would not be paid but that CJI's claim against Reading would be honored. The district court allowed the set off and required Reading to issue notes for only the amount of its obligation in excess of the notes issued in the CNJ reorganization. We reversed that order as we treated the rules against set offs as applicable even though both CJI and Reading were no longer ongoing railroads. It is apparent from Reading that CJI was relying on principles of railroad reorganization when it was in its interest to do so. Thus it demonstrated its continuity with CNJ. We accepted that continuity of structure there and we do so again.
 
 IV.
 
 18
 CJI argues, relying on In re Erie Lackawanna Ry. Co., 803 F.2d 881 (6th Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 2463, 95 L.Ed.2d 872 (1987), that CNJ's reorganization should be considered a liquidation, and thus it cannot be held liable in this case. In Erie Lackawanna, former Erie Lackawanna (Erie) employees brought asbestos-related personal injury actions against Erie. Like CJI, Erie had previously reorganized under the Bankruptcy Act. Id. at 882. The employees' injuries did not become manifest until after the consummation of the reorganization. Nevertheless prosecution of the employees' actions was enjoined by the district court which held those claims against Erie had been discharged in the reorganization. The court of appeals considered that the issue before it was whether Erie's restructuring under section 77 and the Rail Act was a reorganization or a liquidation for if it was a liquidation there would be no company left against which the action could be brought. 803 F.2d at 883.
 
 
 19
 The court noted that Erie's board of directors chose not to liquidate the company immediately. Id. at 884. Nevertheless, the court held that the reorganization was a liquidation as Erie was not to be preserved as a going concern. Ibid. Accordingly, the judgment of the district court was affirmed.
 
 
 20
 Erie Lackawanna is clearly distinguishable from this case. The plan there called for a liquidation "as expeditiously as practicable," and was characterized by the district court as a "liquidating plan of reorganization." Id. at 882-83. Here CNJ's plan contemplated a corporation which would continue and prosper--as it has. As the district court in our case noted, Erie's "restructuring was not designed to create a new, reorganized company which would continue in existence for the long term." Thus, Erie Lackawanna is not contrary to our result.[8]
 
 V.
 
 21
 We find no basis why CJI should be relieved of liability by operation of either statutory or case law. Accordingly, the order of the district court will be affirmed.
 
 
 
 [1]
 The facts are not in dispute and thus as this appeal involves only the application of legal precepts our review is plenary. United States v. Adams, 759 F.2d 1099, 1106 (3d Cir.), cert. denied, 474 U.S. 906, 971, 106 S.Ct. 275, 336, 88 L.Ed.2d 236 (1985)
 
 
 [2]
 The Rail Act was amended by acts including the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94-210, 90 Stat. 31 (1976) (codified as amended at 45 U.S.C. Secs. 801-855 (1982)) and the Northeast Rail Service Act of 1981, Pub.L. No. 97-35, 95 Stat. 643 (1981) (codified as amended at 45 U.S.C. Secs. 1101-1116 (1982))
 
 
 [3]
 The certificate was actually filed on behalf of CNJ by its trustee
 
 
 [4]
 There are other defendants who allegedly manufactured asbestos but they not involved in this appeal
 
 
 [5]
 The Bankruptcy Code superseded the Bankruptcy Act on October 11, 1979. CJI began its reorganization proceedings in March 1967. As a result, the Bankruptcy Act will apply in this case. See Bankruptcy Reform Act of 1978, Pub.L. No. 95-598, tit. IV, Sec. 403(a), 92 Stat. 2549, 2683 (1978). See also In re Penn Cent. Transp. Co., 831 F.2d 1221, 1222 n. 1 (3d Cir.1987)
 
 
 [6]
 This potential liability for asbestosis claims could be quite substantial. According to the Zulkowskis' brief this action "is one of approximately 48 actions pending under ... FELA naming ... CJI and Conrail" filed in federal and state courts in Pennsylvania and New Jersey
 
 
 [7]
 We also reject CJI's claim that it is insulated from liability in this case since it is not currently a "common carrier by railroad ... engaging in commerce" and Mr. Zulkowski is not "employed by such carrier" as required by the FELA. 45 U.S.C. Sec. 51. We read this section as being applicable if at the time of the exposure leading to the injury the defendant was a railroad engaging in commerce and the plaintiff was its employee. Our construction of 45 U.S.C. Sec. 51 places the loss on the party responsible for it. See Urie v. Thompson, 337 U.S. 163, 187, 69 S.Ct. 1018, 1033, 93 L.Ed. 1282 (1949) ("We do not think the mere difference in the time required for different acts of negligence to take effect and disclose their harmful, disabling consequences would justify excluding [a latent disease] from the Act's coverage...."). See also Schweitzer v. Consolidated Rail Corp., 65 B.R. at 805-07
 
 
 [8]
 Judge Becker does not agree that Erie Lackawanna is distinguishable. He notes that in both cases the bankruptcy proceeding was conducted under the statutory framework--section 77 of the Bankruptcy Act, which "only deals with reorganization." Erie Lackawanna, 803 F.2d at 884 (emphasis in original). Moreover, he believes that the cases are not distinguishable in terms of the "underlying realities" of the case. See ibid. He notes in this regard that in both cases the majority of the railroad's assets, including substantially all rail assets, were transferred to Conrail and the debtor's primary previous business ceased to exist. Although Erie's plan called for expeditious liquidation, it included a provision by which the creditors of the reorganized company could elect to continue it as an operating company. Indeed, in 1983 the Erie board of directors recommended continued existence, and although the shareholder's vote on the recommendation was deferred, at the time Erie Lackawanna was decided there was no assurance that the liquidation would actually take place. Thus the ultimate disposition of Erie does not strike Judge Becker as significantly different from that of CJI
 Judge Becker agrees with the result that the majority reaches in Part IV, however, because he believes that Erie Lackwanna was wrongly decided for the reasons set forth in the other portion of this opinion.