J-A12017-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| BLACKWOOD, INC., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| READING BLUE MOUNTAIN & NORTHERN RAILROAD COMPANY, | |
| Appellee | No. 1633 MDA 2014 |

Appeal from the Order Entered August 29, 2014
In the Court of Common Pleas of Schuylkill County
Civil Division at No(s): S-3238-08

BEFORE:  BOWES, DONOHUE, and ALLEN, JJ.

MEMORANDUM BY BOWES, J.:                    **FILED AUGUST 28, 2015**

Blackwood, Inc. ("Blackwood") appeals from an August 29, 2014 order entering summary judgment in favor of Reading Blue Mountain & Northern Railroad Company ("Blue Mountain") in this quiet title action.  We affirm the trial court's determination that there is no genuine issue of material fact that Blackwood does not own title to the land that it is claiming in this action and therefore affirm the grant of summary judgment in favor of Blue Mountain. We reverse the trial court's refusal to permit Blackwood to amend its complaint to raise a new cause of action, *i.e.*, the right to a private railroad crossing.

On November 6, 2008, Blackwood instituted this quiet title action. Preliminary objections were granted to the original complaint as well as four

subsequent ones. Blackwood's fifth amended complaint, which was filed on January 4, 2011, survived Blue Mountain's preliminary objections. In its fifth amended complaint, Blackwood averred the following. Blackwood "is the landowner of a tract situate in Reilly Township consisting of approximately 2,300 acres as described in a deed of record in Deed Book Volume 0550 at Page 0306, a copy of which is attached hereto and marked Exhibit A." Fifth Amended Complaint, 1/4/11, at ¶ 5. Blackwood's tract "is dissected longitudinally, generally East and West by the rail line of the Reading Blue Mountain and Northern Railroad Company." *Id*. at 6. Based upon a title examination performed by A. Matthew Dudish, whose affidavit was attached to the fifth amended complaint, Blackwood claimed that it had title to that rail line, as set forth in a chain of title outlined in the complaint. Mr. Dudish examined the deeds of record in Schuylkill County and found no exceptions, easements, or other interests in land granted by Blackwood or its predecessors in title to Blue Mountain or its predecessor in title.

Blackwood claimed that Blue Mountain was asserting title to the land underneath the east/west railroad track under two recorded deeds: 1) a deed dated March 29, 1976 between Andrew L. Lewis, Jr. and Joseph A. Castle, as trustees in bankruptcy and grantors of the property of Reading Company, to Consolidated Rail Corporation ("Conrail"), as grantee; 2) a deed dated December 14, 1990, wherein Conrail granted the same lands described in the March 29, 1976 deed to Blue Mountain. Blackwood

maintained that Reading Company never had title to the land under Blackwood's property, and that Conrail, likewise, did not have title to that property. Mr. Dudish's affidavit asserted that he concluded that Blue Mountain did not own any land under any railroad tracks that Blue Mountain operated on Blackwood's land.

Blackwood filed a motion for summary judgment, again asserting ownership of land under railroad tracks running "longitudinally generally East and West by the rail line of the Reading Blue Mountain and Northern Railroad Company (the "Railroad")." Plaintiff Blackwood, Inc.'s Motion For Summary Judgment Pursuant To Pa.R.C.P. 1035.1, et seq., 8/26/13, at ¶ 6. Blackwood repeated the averments in the complaint that Blue Mountain was asserting title over the land by virtue of the 1976 and 1990 deeds and that the grantors in those deeds, Reading Company and Conrail, did not have record title to the land under the track that dissected Blackwood's property. Blackwood's summary judgment request rested on the affidavit of Mr. Dudish, who concluded:

> In-sum, my examination revealed that: (a) the deeds set forth in the chain of title confer ownership in the Plaintiff; Blackwood; (2) there are no recorded deeds regarding the Plaintiff Blackwood's property which confer any ownership interest and/or other rights to the Mine Hill Railroad [the railroad that built the tracks] and/or any of its successors in interest, including the Defendant railroad; and (3) no deeds have been recorded in the Office of Recorder of Deeds in Schuylkill County, which deeds confer ownership to the Defendant railroad in any parcels or tracks located on the Plaintiff, Blackwood's property.

Affidavit, A. Matthew Dudish, 9/14/10, at ¶ 13.

Blue Mountain responded to this motion for summary judgment and filed a cross motion for summary judgment. Blue Mountain more specifically described its railroad tracks that were located on Blackwood's 2,300 acres, indicating that there were three tracks and not just the track running east and west mentioned in Blackwood's complaint and motion for summary judgment. Specifically, the Tremont Extension a/k/a the West End Branch longitudinally dissected Blackwood's land. Two other tracks ran from the Tremont Extension, known as the Swatara Branch and the Middle Creek Extension. Blue Mountain's cross motion for summary judgment claimed ownership of the land under all three railroad lines on Blackwood's surrounding acreage.

The Tremont Extension, the Swatara Branch, and the Middle Creek Extension were built by the Mine Hill and Schuylkill Haven Railroad ("Mine Hill Railroad"). Mine Hill Railroad was established by an act of the Pennsylvania General Assembly on March 24, 1828, referred to as Act 96 by the parties. This Act accorded Mine Hill Railroad the power to take title to land in fee simple by eminent domain. The Pennsylvania legislature later enacted various supplemental legislation authorizing Mine Hill to extend existing lines and add branch lines.

Mine Hill Railroad first built a line, which is not at issue herein, that led north from the town of Schuylkill Haven along the Schuylkill River to a town

then known as Mine Hill. That railroad line became operational in 1831, transporting coal from mines to boats in a canal on the river. In 1829, the Mine Hill Railroad constructed a branch called the West West Branch from its main rail line. The West West Branch ran in a westerly direction starting from Westwood, a town about mid-way between Mine Hill and Schuylkill Haven, and the West West branch ends at Silverton, which is now known as Llewellyn.

The three railroad tracks in question, the Tremont Extension, the Swatara Branch, and the Middle Creek Extension, were built after local landowners asked Mine Hill Railroad to build lines to a recently-opened coal field in the Swatara area. Blue Mountain attached the affidavit of Richard B. Frey to its cross motion for summary judgment. Mr. Frey established his knowledge of the relevant railroad history and indicated that Mine Hill constructed the rail routes at issue in this litigation pursuant to the legislative acts authorizing Mine Hill Railroad to exercise eminent domain powers. Blue Mountain's Motion for Cross Motion for Summary Judgment, 1/29/14, ¶¶ 52-64, Exhibit F ¶¶ 8-14. Mr. Frey reported that, in 1845, Mine Hill constructed the seven-and-a-half-mile stretch of east-west track known as the "Tremont Extension." *Id.*, Exhibit F ¶¶ 13, 15. The Tremont Extension began in Silverton (now Llewellyn), and ended to the west in Tremont. In November 1850, Mine Hill constructed a three-mile branch line on the Tremont Extension that ran north-northwest and was known as the

"Swatara Branch." *Id.*, Exhibit F ¶ 17. The Swatara Branch started at Swatara Junction, which is slightly to the east of Tremont. In 1851, Mine Hill added another branch line running off the Swatara Branch in a westerly direction, known as the "Middle Creek Extension." *Id.*, Exhibit F ¶ 18. Over time, the Tremont Extension became known as the "West End Branch." *Id.*, Exhibit F ¶ 21. Portions of the West End Branch, Swatara Branch, and Middle Creek Extension traverse the property now owned by Blackwood. *Id.*, Exhibit F ¶¶ 13-18; Blackwood's Answer to Blue Mountain's Cross Motion for Summary Judgment, 4/14/14, ¶ 63.

Mine Hill owned and operated these three lines until May 1864, when they were leased to the Philadelphia and Reading Railroad, which continued to operate them until 1924. Blue Mountain's Cross Motion for Summary Judgment, 1/29/2014, Exhibit F ¶ 20. In 1924, the Philadelphia and Reading Railroad became known as the Reading Company. *Id.* Reading Company utilized these three lines until April 1976. In October 1951, Reading Company purchased all of the remaining shares of Mine Hill Railroad stock in private hands and merged Mine Hill Railroad into Reading Company. *Id.*, Exhibit F ¶ 24. Thus, Reading Company became the owner of all of Mine Hill Railroad's tracks as of October 1951.

In 1976, Reading Company sold its railroad tracks to Conrail. Mr. Frey's affidavit states that Reading Company transferred the West End Branch, the Swatara Branch, and Middle Creek Extension in the 1976 deed

to Conrail. *Id.*, Exhibit F ¶ 27. The 1976 deed did not identify these three rail lines by name, but instead transferred them to Conrail by reference to line codes 0350 and 0383 as designated by the United States Railway Association. *Id.*

Finally, Mr. Frey also indicated that, in December 1990, Conrail sold these three rail lines (again described by reference to line codes 0350 and 0383) to Blue Mountain. *Id.*, Exhibit F ¶ 29. Accordingly, Mr. Frey concluded that ownership of the land beneath the rail lines traversing Blackwood's property (the Tremont Extension a/k/a West End Branch, the Swatara Branch, and the Middle Creek Extension), was originally obtained by eminent domain by Mine Hill Railroad pursuant to Act 96, procured by Reading Company by merger with Mine Hill Railroad, deeded by Reading Company to Conrail in 1976, and then sold by Conrail to Blue Mountain in December 1990. *Id.*, Exhibit F ¶¶ 30-32. Based upon these uncontested facts, Blue Mountain asserted that it owned the land underneath the Tremont Extension, the Swatara Branch, and the Middle Creek Extension.

On May 16, 2014, approximately one week before the date scheduled for oral argument on the summary judgment motions, Blackwood filed a motion requesting leave to amend its fifth amended complaint to assert, pursuant to Act 96, a right to between three and five private crossings over Blue Mountain's rail lines in the event the trial court granted Blue Mountain's cross motion for summary judgment. By order dated August 29, 2014, the

trial court issued an order and opinion denying Blackwood's motion for summary judgment, granting Blue Mountain's cross motion for summary judgment, and denying Blackwood's motion for leave to amend the fifth amended complaint.

On September 26, 2014, Blackwood filed a timely notice of appeal. On appeal, Blackwood raises two issues for our consideration and determination:

I.    Whether the trial court erred in denying Blackwood's motion for summary judgment and granting [Blue Mountain]'s cross motion for summary judgment in the quiet title action?

II.   Whether the trial court abused its discretion in denying Blackwood's motion to amend its pleadings so that, in the event the trial court ruled in favor of [Blue Mountain] on its counterclaim to quiet title, Blackwood could have its claim for the statutory right to private crossings over the rail lines adjudicated?

Blackwood's Brief at 4.

For its first issue on appeal, Blackwood challenges the trial court's decision to deny its motion for summary judgment and grant Blue Mountain's cross motion for summary judgment. The standard of review for an order granting a motion for summary judgment is as follows:

A reviewing court may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion. As with all questions of law, our review is plenary.

In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the

summary judgment rule. Pa.R.C.P. 1035.2. The rule states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. Failure of a non[-]moving party to adduce sufficient evidence on an issue essential to his case and on which it bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law. Lastly, we will view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.

*JP Morgan Chase Bank, N.A. v. Murray*, 63 A.3d 1258, 1261–62 (Pa.Super. 2013) (quoting *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001)).

The following principles apply in a quiet title action. "[W]hen reviewing a decision in a quiet title action, we must determine whether the trial court's findings are supported by competent evidence," *Herr v. Herr*, 957 A.2d 1280, 1285 (Pa.Super. 2008), and we will not reverse "in the absence of an error of law or a capricious disregard of evidence." *Montrenes v. Montrenes*, 513 A.2d 983, 984 (Pa.Super. 1986). The burden of proof in an action to quiet title is on the plaintiff, *Cox's, Inc. v. Snodgrass*, 92 A.2d 540, 541-42 (Pa. 1952), who may recover only on the strength of his or her own title and not upon the weakness of the defendant's title. *Albert v. Lehigh Coal & Navigation Co.*, 246 A.2d 840, 843 (Pa. 1968); *Carratelli v. Castrodale*, 137 A.2d 805, 806 (Pa.Super. 1958). The plaintiff first has the burden of proving a *prima facie* title, proof

of which is sufficient until a better title is shown by the defendant. If the plaintiff makes out a *prima facie* claim of title, the burden shifts to the defendant to go forward with evidence to establish his own title to defeat the plaintiff's apparent ownership. **Golden v. Ross**, 186 A. 249, 249 (Pa.Super. 1936); **Babcock Lumber Co. v. Faust**, 39 A.2d 298, 301 (Pa.Super. 1944).

Blackwood's first issue on appeal contests the trial court's determination that Blue Mountain has title to the land under the three rail lines. In its opinion, the trial court indicated that Blackwood met its initial burden to set forth a *prima facie* title to the entirety of its 2,300-acre parcel of land, and that as a result, it was necessary for Blue Mountain to establish superior title. Trial Court Opinion, 8/29/2014, at 10. The trial court also recognized that Blue Mountain's claim to title "cannot be established based upon a search of the Recorder of Deeds alone," **id.**, as there are no recorded deeds evidencing ownership until the 1976 deed from Reading to Conrail.

On appeal, Blackwood raises two substantive challenges to the trial court's grant of summary judgment on Blue Mountain's claim of title. First, Blackwood contends that Blue Mountain has proffered no evidence that Mine Hill Railroad ever complied with the requirements of Act 96 to obtain ownership of the land beneath the three rail lines in question by eminent domain. Since Mine Hill Railroad never owned the land, Blackwood continues, Blue Mountain's predecessors in interest had no ownership interest to convey to Conrail, and thus, Conrail had no interest to convey to

Blue Mountain. Second, Blackwood avers that even if Mine Hill Railroad obtained title by eminent domain, the trial court erred in ruling that the 1976 and 1990 deeds conveyed any interest in the property to Conrail or Blue Mountain, as these deeds do not contain any reference to, or description of, the land beneath the rail lines on Blackwood's property.

To develop transportation systems in the nineteenth century, the Pennsylvania legislature enacted a wide variety of land grant legislation, creating railroad and turnpike corporations as well as aqueduct, road, bridge, and canal authorities. *See generally* Peter Karsten, Supervising the "Spoiled Children of Legislation": Judicial Judgments Involving Quasi-Public Corporations in the Nineteenth Century U.S., 41 Am. J. Legal Hist. 315, 315 (1997). In creating these new legal entities, the legislature gave them, *inter alia*, the ability to raise funds through stock and bond subscriptions, and eminent domain powers to take private property through some system of arbitrated compensation. *Id.* With respect to the eminent domain powers granted to railroad corporations, land grant legislation generally set forth a three-step process:

> The successive steps contemplated … as necessary to vest a title to the road-way in the corporation, are these: *First.* A preliminary entry on the lands of private owners for the purpose of exploration. This is made by engineers and surveyors, who run and mark one or more experimental lines, and who report their work, with such maps and profiles as may be necessary to present it properly to the company that employs them. *Second.* A selection and adoption of a line, or one of the lines, so run, as and for the location of the proposed railroads. This is done by

- 11 -

the corporation, and it requires the action in some form of the board of directors. This makes what was before experimental and open a fixed and definite location. It fastens a servitude upon the property affected thereby, and so takes from the owner and appropriates to the use of the corporation. *Third.* Payment to the owner for what is taken and the consequences of the taking, or security that it shall be made, when the amount due him is legally ascertained. The title of the owner is not divested until the last of these steps has been taken.

***Williamsport & N. B. R. Co. v. Phila. & E. R. Co.***, 21 A. 645, 646 (Pa. 1891).

Act 96 was one such instance of land grant legislation. It created the Mine Hill Railroad and gave it the ability to raise capital. Act 96, §§ 1-12. Act 96 also gave Mine Hill Railroad the power to exercise eminent domain pursuant to the above-described three-step process. With respect to the first two steps of the process, § 14 of Act 96 gave Mine Hill Railroad representatives the right to enter onto private property for the purpose of determining an appropriate route.[1] Section 13 instructed Mine Hill Railroad's president and board of directors, after adopting a specific route, to provide public notice of its precise location by the filing of a map in the office of Pennsylvania's Secretary of State:

SECT. 13. *And be it further enacted by the authority aforesaid,* That the president, directors and company of the said rail road

---

[1] Section 14 further provides that "it shall be lawful for the president, directors and company of the said rail road company, and their agents and all persons employed by or under them for the purpose contemplated in this act, to enter upon any land which they shall deem necessary for laying out said road." Act 96, § 14.

company shall have the power to survey, lay down, ascertain, mark and fix such route as [it] shall deem expedient for said rail road, beginning at or near Schuylkill Haven, in the county of Schuylkill, as near as the ground will admit, to the Mine Hill, having due regard to the situation and nature of the ground, and of the buildings thereon, the public convenience and the interest of the stockholders, and so as to do the least damage to private property, and the said road shall not be more than five rods wide, and shall not pass through any burying ground nor place of public worship, or any dwelling house without the consent of the owner thereof, nor shall it pass through any out buildings of the value of three hundred dollars without such consent; and the said president, directors and company, shall within six months after ascertaining the route of the said rail road, cause an accurate survey of the lines of the said road to be made, a map or plot of which survey they shall cause to be filed in the secretary's office of this state, which map or plot or a certified copy thereof shall be sufficient evidence of the course of the said road, which may then be opened and all the expenses incurred thereby shall be defrayed by said company: *Provided*, that the said rail road shall be made double, so as to accommodate the trade ascending as well as descending the same.

*Id*. § 13. With respect to the third step of the process, § 15 authorized corporate representatives to negotiate and contract for the purchase of real property along the chosen route, *id*. § 15, and § 16 granted Mine Hill Railroad the power of eminent domain if the landowners refused to voluntarily contract at an agreed-upon price, including a multi-step process to determine just compensation due and payable to the landowner. Section 16 made clear, however, that absent the consent of the landowner, Mine Hill Railroad had no right to use of the property until just compensation was paid:

Provided, that the payment of damages aforesaid, for land through which the said road may be laid, shall be made before

- 13 -

the said company, or any person under their direction, or in their employ, shall be authorised to enter upon and break ground in the premises, except for the purposes of surveying and laying out said road, unless the consent of the owner of such land be first obtained.

*Id*. at § 16.

Blackwood contends that Blue Mountain, in connection with its cross motion for summary judgment, offered no evidence that Mine Hill Railroad took any actions in compliance with these sections of Act 96. Blackwood thus argues that the trial court erred in concluding that Mine Hill Railroad ever obtained ownership of the property beneath the three rail lines presently on Blackwood's property. Blackwood asserts that its evidence, including searches of public and private records, demonstrates the absence of any of the following relevant documentation:

> (i) any deeds of record reflecting title to the Subject Property in any railroad prior to the Reading Company[;] (ii) any recorded releases from owners of property who were predecessors of Blackwood conveying property or property rights or acknowledging payment from any predecessor of [Blue Mountain] pertaining to the Subject Property; (iii) any formal corporate action by the governing board of any predecessor to [Blue Mountain] describing the Subject Property or property to be taken under the Act of 1828; (iv) any plan of the Subject Property of record in the real estate records of Schuylkill County, or (iv) any map of the Subject Property recorded in the Pennsylvania Secretary of State's office. No such documents exist.

Appellant's Brief at 28-29. As a result, Blackwood asserts that genuine issues of material fact remain for resolution.

However, Pennsylvania appellate courts have recognized an evidentiary presumption in favor of railroads. In particular, after a lapse of twenty years, a railroad may base its claim to title on the presumption that "the land was paid for, or that there was some form of written grant which has since become lost." *Coxe v. Lehigh Valley R.R. Co.*, 158 A.2d 782, 786 (Pa. 1960); *see also Brankin v. Phila., Newtown & N.Y. R.R. Co.*, 133 A. 563, 564 (Pa. 1926) ("[T]here is, nevertheless, the presumption, after 20 years from the time the right to the damages accrued, that they have been paid."). This twenty-year presumption is rebuttable, and the party against whom the presumption is applied may rebut it with evidence that payment for or grant of the land never occurred. *Coxe*, *supra*. "Whether the facts and evidence relied upon to rebut the presumptions are true, is a question of fact for the jury; but whether, if true, they are sufficient to rebut the presumption, is a question of law for the court." *Id.*

Our Supreme Court most recently applied this presumption in *Coxe*, a case with certain factual similarities to the present one. In *Coxe*, the railroad constructed double track rail lines in 1884, and in connection with a dispute over coal rights more than seventy years later, the plaintiff claimed that the railroad had done so "without right or paying compensation therefor," pointing out that there was no evidence of payment or any deed or other writing giving the railroad title to the disputed surface rights to the land. *Id.* at 784-87, 789. Our Supreme Court affirmed both the trial court's

- 15 -

application of the twenty-year presumption in favor of the railroad and its ruling that exhibits offered by the plaintiff, most of which reflected only the absence of any paper title to the property, failed to rebut the presumption. *Id*. at 787-89. In so ruling, our Supreme Court made clear that the presumption may not be rebutted merely by highlighting the absence of evidence of payment, and instead held that rebuttal requires affirmative proof that the railroad did not pay just compensation or acquire some other form of grant for title to the property. *Id.*

In the present case, the trial court applied the evidentiary presumption in favor of Blue Mountain and ruled that Blackwood "has not provided sufficient and competent evidence that the railroad did not compensate the landowners for taking the land through eminent domain[.]" Trial Court Opinion, 8/29/2014, at 14. Blackwood now contends that the trial court erred in failing to recognize the evidence it presented that shows

> the **non-existence** of (a) any grant or deed, (b) evidence of payment, as the same should have been evidenced by the recording of releases, but there are none recorded in this matter . . ., (c) a properly recorded map depicting the line of the route across Blackwood's property, and (d) any corporate documentation describing the property to be taken by eminent domain power.

Appellant's Brief at 26 (emphasis in original).

With respect to (a) and (b), the recognition that there are no filed grants, deeds, or evidence of payment does not rebut the presumption. As indicated, the Supreme Court in *Coxe* rejected any suggestion that the

- 16 -

presumption could be rebutted by testimony and exhibits showing the absence of any documentation confirming the railroad's title to the surface rights to the land in question. The Supreme Court in **Coxe** found that this evidence "adds nothing to the case," as the "only important thing is that it shows no paper title, but that is already conceded." **Coxe**, 158 A.2d at 788. Similarly in this case, the absence of filed grants, deeds, or evidence of payment proves only that Blue Mountain cannot produce documentation to demonstrate Mine Hill Railroad's exercise of its eminent domain powers. Because of the presumption, however, the evidentiary burden has shifted from Blue Mountain to Blackwood, and the lack of documentation proving Mine Hill's acquisition of title by eminent domain is not a sufficient rebuttal to create a genuine issue of material fact.

The apparent non-existence of a filed map or corporate resolution depicting the lines or adopting the location of the rail lines also does not rebut the presumption. Where a railroad claims title by the exercise of eminent domain, the **Coxe** evidentiary presumption is a presumption of payment of just compensation. **Id**. at 786. The presumption does not extend to other steps in the eminent domain process. **See generally Williamsport & N. B. R. Co.**, **supra** at 646 (setting forth the three-step process for the exercise of eminent domain in land grant legislation).

Blackwood alternatively argues that the absence of either a corporate resolution by Mine Hill adopting the present rail line or a map filed with the

secretary of state's office depicting the current line as required by § 13 of Act 96 is proof that Mine Hill Railroad failed to comply with the prerequisites for the exercise of eminent domain pursuant to Act 96.[2]  Blackwood's brief at 23.  Blackwood asserts that "a corporation cannot exercise the power to appropriate land until it has fixed the location of its line . . . as a property owner's right to damages from the specific appropriation of real property at issue in any given matter does not arise until the appropriation has been fixed." *Id*. (citing, *e.g.*, *Foley v. Beech Creek Extension R.R. Co.*, 129 A. 845, 846 (Pa. 1925) ("the enabling acts delegating the power or authority to exercise the right of eminent domain are to be strictly construed")).

The present case, however, does not involve a property owner's right to damages in eminent domain proceedings.  In the current quiet title action, the issue of Mine Hill Railroad's compliance (or lack thereof) with the corporate resolution/map filing requirements of § 13 of Act 96 is irrelevant for the following reasons.  As quoted hereinabove from our Supreme Court's 1891 decision in the *Williamsport & N. B. R. Co.* case, the second step of the eminent domain process is for the railroad corporation to formally adopt a specific route for the new rail line by "an action in some form" by its board of directors.  *Williamsport & N. B. R. Co.*, *supra* at 646.  As described in §

---

[2]  In particular, Blackwood relies upon a certification from the Pennsylvania Department of State confirming that it has no route map on file from Mine Hill.

13 of Act 96, this second step required the filing of a map "in the secretary's office of this state, which map or plot or a certified copy thereof shall be sufficient evidence of the course of the said road." Act 96, § 13.

The requirement of a corporate act designating the specific route of a rail line to be acquired by eminent domain has been referred to as the act of "location." *Id*. Pennsylvania courts have identified two purposes for the requirement of the act of location. First, it immediately provides the railroad corporation with title as against all third parties and other corporations, precluding these other entities, including rival railroad corporations, from making competing claims on the property. *See*, *e.g.*, *Underwood v. Pennsylvania M. & S. R.R. Co.*, 99 A. 64, 65 (Pa. 1916). Second, it provides conditional title as against the property owners along the route, which ripens into absolute title upon the payment of just compensation. *Id.*; *Williamsport & N. B. R. Co.*, *supra* at 646. As "conditional title," the act of location "merely amounts to a notice to him that the company intends to condemn the land, and that any act done by him subsequent thereto affecting the property and inconsistent with the use for which the condemnation proceedings are contemplated must be done at his risk." *Underwood*, 99 A. at 65. The act of location does not divest the property owner of actual title, as title instead passes to the railroad by eminent domain only when just compensation is paid. *Id.*; *Williamsport & N. B. R. Co.*, *supra* at 646.

In an action by a property owner against a railroad corporation for damages, or by a rival railroad on a competing claim for title, whether the railroad corporation at issue properly completed the act of location would be an important issue. In the present quiet title case, however, whether Mine Hill Railroad obtained title to the land beneath the rail lines in question by eminent domain from the property owners at the time of their construction depends exclusively on whether Mine Hill Railroad paid just compensation as provided by Act 96. As discussed *supra*, absent rebutting evidence from Blackwood, the twenty-year evidentiary presumption resolves the issue of payment. Mine Hill Railroad's compliance with the location requirements in § 13 of Act 96 is, for present purposes, irrelevant.

For these reasons, we conclude that the trial court did not err in its grant of summary judgment to Blue Mountain on the issue of Mine Hill Railroad's acquisition of title by eminent domain pursuant to Act 96. Thus, we hold that Blue Mountain established that there was no genuine issue of material fact that Mine Hill Railroad was the legal owner of the land under the three railroad tracks now located on Blackwood's acreage. Concomitantly, Reading Company, after it merged with Mine Hill Railroad in 1951, became the legal owner of the Tremont Extension a/k/a the West End Branch as well as the Swatara Branch and the Middle Creek Extension.

This conclusion brings us to Blackwood's challenges to the 1976 and 1990 deeds. First, however, we question whether Blackwood has the right

to contest whether the 1976 and 1990 deeds passed ownership of the land beneath these three rail lines from Mine Hill Railroad's successors in interest, Reading Company, to Conrail and from Conrail to Blue Mountain.

Blue Mountain established that there was no genuine issue of material fact that, as of 1976, Reading Company was the legal title holder to all three branches at issue herein. Assuming, for the sake of argument, that the 1976 and 1990 deeds did not pass title to the Tremont Extension, the Swatara Branch, and the Middle Creek Extension, that does not mean that Blackwood owns the land under the railroad tracks. Any conclusion that the 1976 and 1990 deeds did not operate to convey these railroad tracks merely means that the tracks were not conveyed by Reading Company and Conrail, and that either Reading Company or Conrail continues to own them.

Since Reading Company owned and operated all three branches located on Blackwood's property, Blackwood's ownership of the bed under the three railroad tracks located on its land is entirely dependent upon whether the tracks were abandoned. *Dellach v. DeNinno*, 862 A.2d 117, 118 (Pa.Super. 2004) ("When a railroad abandons an easement, the right-of-way is extinguished and the land is owned in fee simple by the owner or owners of the land on either side of the right-of-way."). Reading Company never abandoned these tracks, having operated its trains on the lines until it sold its tracks to Conrail, which also continually used the lines. Likewise, Blue Mountain never ceased utilization of any of the three tracks in question

after it obtained the railroad tracks in 1990. No railroad filed an intent to abandon the tracks. In fact, Blackwood has never even asserted that any railroad abandoned these three tracks.

Blackwood only proved that it owned the 2,300 acres upon which the railroad tracks were located. Blue Mountain came forward with evidence that Blackwood did not own the land under any of the three tracks at issue herein because Reading Company acquired title to them. Blackwood did not obtain title through Reading Company, and Blackwood made no claim that any tract was abandoned. Thus, Blackwood can obtain no relief in this quiet title action even if the 1976 and 1990 deeds are construed so as to fail to transfer title to the Tremont Extension, the Swatara Branch, and the Middle Creek Extension. Assuming that to be true, Blackwood is not the owner of the land underneath the three railroad tracks.

Nevertheless, we agree with Blue Mountain's position that it did acquire title to the land under the Tremont Extension, the Swatara Branch, and the Middle Creek Extension pursuant to the 1976 and 1990 deeds. Blackwood argues that the two deeds, which utilize line codes developed by the United States Railway Association to describe the property conveyed, do not specifically identify Blackwood's land. Blackwood's brief at 30-34, 36-38. Blackwood asserts that the inadequacies in the 1976 and 1990 deeds leave for resolution a genuine issue of material fact as to whether title to the real property at issue has been conveyed to Blue Mountain. *Id.*

We begin with the 1976 deed, which provides that Reading Company conveyed to Conrail all of its "right, title and interest in such rail properties, free and clear of any liens or encumbrances," including:

> A. All of Grantors right, title and interest, legal and equitable, in and to the real property located in the County of Schuylkill, Commonwealth of Pennsylvania as described in Exhibit A.

1976 Deed, 3/29/76, at 1. Exhibit A contains descriptions of the rail lines conveyed, using the line code for each such line. The descriptions identified by the parties as relevant to the present inquiry are as follows:

> [Line Code 0350:]
>
> Situate in the County of Schuylkill, Commonwealth of Pennsylvania, and being the Reading's line of Railroad known as the West End Branch and being all the real property in the County lying in, under, above, along, contiguous to, adjacent to or connecting to such line.
>
> Such line originates in the County near Westwood, connecting to another line of railroad known as West End Branch, passes through Tremont, and Good Spring and terminates in the County near Keffers.
>
> The line of railroad described herein is identified as Line Code 0350 in the records of the United States Railway Association.
>
>       \*      \*      \*
>
> [Line Code 0383:]
>
> Situate in the County of Schuylkill, Commonwealth of Pennsylvania, and being the Reading Company's line of railroad known as the Swatara Colliery Branch and being all the real property in the County lying in, under, above, along, contiguous to, adjacent to or connecting to such line.

Such line originates in the County near Swatara Junction in Reilly, connecting to another line of railroad known as the Reading West End Branch, and terminates in the County in Reilly after 1.8 miles.

The line of railroad described herein is identified as Line Code 0383 in the records of the United States Railway Association.

Blackwood's Answer to Blue Mountain's Cross Motion for Summary Judgment, 4/14/14, at Exhibit A.

The 1990 Deed sets forth the following conveyance from Conrail to Blue Mountain:

ALL THAT CERTAIN PROPERTY OF THE Grantor, together with all of the improvements thereon, being those portions of Grantors lines of railroad known as the Reading Cluster, situate in Berks, Carbon, Columbia, Northumberland and Schuylkill Counties, Pennsylvania … described in Exhibits "A" and generally indicated in Exhibit "B" hereof.

*Id*. As in the 1976 Deed, Exhibit A to the 1990 Deed conveys the real property beneath the rail lines identified by line codes 0350 and 0383 as follows:

[Line Code 0350:]

ALL THAT CERTAIN property of the Grantor, being a portion of the line of railroad known as the West End Branch (aka Good Spring Industrial Track) and identified as Line Code 0350 in the Recorder's Office of Schuylkill County, Pennsylvania in Book1262 at page 433, situate in the County of Schuylkill and Commonwealth of Pennsylvania; the BEGINNING and ENDING being indicated on Grantor's Case Plan No. 69801, sheets 15 of 28 and 16 of 28, which is attached hereto and made a part hereof as Exhibit "B"[.]

\*     \*     \*

- 24 -

[Line Code 0383:]

ALL THAT CERTAIN property of the Grantor, being a portion of the line of railroad known as the Swatara Colliery Branch (aka Swatara Industrial Track) and identified as Line Code 0383 in the Recorder's Office of Schuylkill County, Pennsylvania in Book 1262 at page 438, situate in the Township of Reilly, County of Schuylkill and Commonwealth of Pennsylvania; the BEGINNING and ENDING being indicated on Grantor's Case Plan No. 69801, sheets 18 of 28 and 19 of 28, which is attached hereto and made a part hereof as Exhibit "B"[.]

*Id*. Exhibit B. Exhibit B to the 1990 Deed contains maps depicting the beginning and end of each rail line conveyed, including the four maps relating to line codes 0350 and 0383.

Based upon our careful review of the certified record on appeal, including in particular the above descriptions and maps, line code 0350 adequately describes the Tremont Branch a/k/a the West End Branch, and line code 0383 adequately describes the Swatara Branch. While it is true, as Blackwood asserts, that the line code descriptions of these two lines only identify the beginnings and ends of the lines without specific reference to those portions of the lines on Blackwood's property, Blackwood has not submitted any evidence to create a genuine issue of material fact. Blackwood admits that portions of the Tremont Extension and Swatara Branches traverse its property. Blackwood's Answer to Blue Mountain's Cross Motion for Summary Judgment, 4/14/14, ¶ 63. Mr. Frey's affidavit provides that these two lines have been in continuous operation for more than 150 years, and neither party has submitted any evidence that the

location of these lines has ever changed. Blue Mountain's Motion for Cross Motion for Summary Judgment, 1/29/14, Exhibit F ¶ 31. As a result, we conclude that the 1976 and 1990 deeds clearly conveyed the real property beneath the Tremont Extension and Swatara Branches, including those portions located on Blackwood's 2300-acre tract, to Blue Mountain.[3]

We also hold the 1976 and 1990 deeds were sufficient to convey the Middle Creek Extension to Blue Mountain. In 1973, the United States

_____

[3]  Blackwood also argues that the trial court erred in granting summary judgment in favor of Blue Mountain because a genuine issue of material fact still exists regarding the nature of the property interest that Blue Mountain owns (a railroad right of way or an easement). We disagree. Pennsylvania courts have consistently held that when exercising eminent domain, railroads acquire a "railroad right of way," namely "a right to exclusive possession, to fence in, to build over, the whole surface, to raise and maintain any appropriate superstructure, including necessary foundations, and to deal with it, within the limits of railroad uses, as absolutely and as uncontrolled as an owner in fee." *Pa. Schuylkill Valley R.R. Co. v. Reading Paper Mills*, 24 A. 205, 205 (Pa. 1892); *see also Brookbank v. Benedum-Trees Oil Co.*, 131 A.2d 103, 112 (Pa. 1957); *Lacy v. E. Broad Top R.R. & Coal Co.*, 77 A.2d 706, 708 (Pa.Super. 1951).

Contrary to Blackwood's contention, *Mackall v. Fleegle*, 801 A.2d 577 (Pa.Super. 2002), does not suggest a contrary result. *Mackall* involved a disputed interpretation of the language in a documented quitclaim transfer of real property by two private citizens to a railroad company. *Id.* at 581-82. Based upon the contents of the transferring document, we concluded that it conveyed an easement over real property rather than a fee simple interest. *Id.* at 582. Although the 1976 and 1990 deeds likewise involve quitclaim transfers, no similar issue exists in this case. Mine Hill Railroad obtained a railroad right of way by eminent domain, and the 1976 and 1990 deeds both transfer **all** of the property interests owned by the grantor to the grantee. As such, Blue Mountain now owns a railroad right of way to the real property beneath the Tremont Extension and Swatara Branches.

government passed the Regional Rail Reorganization Act, 45 U.S.C. §§ 701, *et seq*. In § 701, Congress articulated the following pertinent findings. Essential rail service in the northeastern United States was being provided by insolvent railroads undergoing reorganization under the Bankruptcy Act. Rail service was being threatened with cessation or curtailment because the trustees of the bankrupt railroads were unable to formulate acceptable reorganization plans. The rail lines, which were built for public use, were deteriorated and in need of rehabilitation and modernization. There was a public need for adequate rail service in the northeastern region in the areas of commerce, national defense, the environment, passenger service, mail, and freight and for the use of private citizens and state and local governments. That public need required the Federal Government to take action.

Among the articulated purposes of the Regional Rail Reorganization Act were: 1) to identify all rail service systems in the northeast region that could not adequately meet the stated public needs; 2) to reorganize those railroads into an "economically viable system capable of providing adequate and efficient rail service to the region;" and 2) to establish Conrail. 45 U.S.C. § 701(b)(2), (b)(5).

Reading Company was one of the northeastern private railroads in bankruptcy, having entered bankruptcy re-organization in 1971. ***In the Matter of Reading Co.***, 838 F.2d 686 (3rd Cir. 1988). All of Reading

Company's lines were transferred to Conrail pursuant to the Regional Rail Reorganization Act, and, thereafter, Reading Company ceased to function as a railroad. *Id*. The deed from Reading Company transferring its railroads to Conrail was executed in 1976. Conrail consistently used the Tremont Extension, the Swatara Branch, and the Middle Creek Extension from 1976 to 1990. On December 15, 1990, Conrail sold its railroad tracks located in Schuylkill County to Appellee. Appellee utilized all the pertinent rail lines, including the Middle Creek Extension, without interruption until this lawsuit was filed.

As we outlined in *Ralston v. Ralston*, 55 A.3d 736, 742 (Pa.Super. 2012) (emphasis added), when this Court interprets a deed, our

> primary object must be to ascertain and effectuate what the parties themselves intended. The traditional rules of construction to determine that intention involve the following principles. First, the nature and quantity of the interest conveyed must be ascertained from the deed itself and cannot be orally shown in the absence of fraud, accident or mistake. We seek to ascertain not what the parties may have intended by the language but what is the meaning of the words they used. Effect must be given to all the language of the instrument, and no part shall be rejected if it can be given a meaning. If a doubt arises concerning the interpretation of the instrument, it will be resolved against the party who prepared it. To ascertain the intention of the parties, **the language of a deed should be interpreted in the light of the subject matter, the apparent object or purpose of the parties and the conditions existing when it was executed**.

Reading Company's March 29, 1976 deed to Conrail conveyed, "All of Grantors right, title and interest, legal and equitable, in and to the real

property located in the County of Schuylkill, Commonwealth of Pennsylvania as described in Exhibit A." Exhibit A describes the line codes for the Tremont Extension and the Swatara Branch.

We interpret a deed's language in the light of the subject matter, the apparent objective of the deed, and the conditions existing when it was executed. The Tremont Extension, the Swatara Branch, and the Middle Creek Extension were contemporaneously constructed to access coal in the Swatara area and were small lines that were all arms of the West West Branch of the Mine Hill and Schuylkill Haven Railroad line. The language in the 1976 deed demonstrates that Reading Company was transferring its rail lines in Schuylkill County and the line numbers for the Tremont Extension and the Swatara Branch were specifically referenced. Middle Creek Extension is an arm of the Swatara Branch.

The impetus behind the deed was to transfer railroad lines from a bankrupt private railroad to a larger railroad created by the federal government under a federal reorganization act. This act promoted a variety of significant public needs. The Third Circuit Court of Appeals has stated that Conrail assumed control over **all** the Reading Company tracks pursuant to Reading Company's bankruptcy re-organization. ***In the Matter of Reading Co.***, ***supra***.

Thus, the deed's subject matter, the deed's objective, the circumstances surrounding the deed's execution, and legal authority all

establish that the 1976 deed transferred Reading Company's Middle Creek Extension, together with the Tremont Extension and the Swatara Branch, to Conrail. Reading Company's intent to transfer the Mill Creek Extension to Conrail is further reinforced by the fact that Conrail thereafter continuously operated its trains on the Middle Creek Extension. *Lupyan v. Lupyan*, 397 A.2d 1220, 1224 (Pa.Super. 1979) ("the conduct of the parties subsequent to the execution of the deed is relevant" in construing its terms).

The December 1, 1990 deed from Conrail to Blue Mountain likewise granted to Appellee "ALL THAT CERTAIN PROPERTY OF THE Grantor, together with all of the improvements thereon, being those portions of Grantors lines of railroad known as the Reading Cluster, situate in Berks, Carbon, Columbia, Northumberland and Schuylkill Counties, Pennsylvania." The trial court noted that the Reading Cluster of Conrail's lines included all the Schuylkill County lines in question. Again, the line codes mentioned in the exhibit to the 1990 deed reference both the Tremont Extension and the Swatara Branch, from which the Middle Creek Extension extends. Blue Mountain thereafter utilized the Middle Creek Extension. For the reasons outlined regarding the 1976 deed, the 1990 deed likewise conveyed the Middle Creek Extension to Appellee, which utilizes that extension sixteen times a month for the public needs. Hence, the deeds in question operated to convey all the railroad tracks currently on Blackwood's surrounding property to Blue Mountain.

Blackwood's remaining contention is that the trial court improperly refused to grant it leave to amend its complaint in order to assert that it is entitled to a private railroad crossing.

> A party, either by filed consent of the adverse party or by leave of court, may at any time change the form of action, add a person as a party, correct the name of a party, or otherwise amend the pleading. The amended pleading may aver transactions or occurrences which have happened before or after the filing of the original pleading, even though they give rise to a new cause of action or defense. An amendment may be made to conform the pleading to the evidence offered or admitted.

Pa.R.C.P. 1033. We have observed that, "Leave to amend lies within the sound discretion of the trial court and the right to amend should be liberally granted at any stage of the proceedings unless there is an error of law or resulting prejudice to an adverse party." *Morrison Informatics, Inc. v. Members 1st Credit Union*, 97 A.3d 1233, 1240 (Pa.Super. 2014) (citation omitted).

Herein, amendment was denied on two bases: that the amendment asserted a new cause of action for which the statute of limitations had expired, and that Blue Mountain would have been prejudiced by the amendment requested just prior to oral argument on the cross motions for summary judgment.

As to the statute of limitations issue, Blackwood has cited a case that supports its position that a statute of limitations might be inapplicable in this matter. In *Estate of Spickler v. County of Lancaster Bd. of Com'rs*,

577 A.2d 923 (Pa.Super. 1990), this Court construed a railroad act as creating a vested right to one private crossing over a railroad track that dissects a landowner's property if the landowner has no access to a public railroad crossing. The plaintiff therein brought a quiet title action claiming title to an easement running across property that was a former railroad bed. The railroad obtained the railroad bed by eminent domain in 1881, and the tracks it built bisected property owned by Brandt into northern and southern portions, but a railroad crossing was not built for Brandt.

Instead, Brandt used a right-of-way running along the northern part of the railroad tracks to access the northern portion of his property, which Brandt sold to Gibble. Gibble conveyed that parcel to Groff, from whom Spickler purchased that land. The deeds to Gibble and Groff mentioned the easement running along the northern boundary of the tracks. The deed from Groff to Spickler, however, referenced an easement acquired in 1909. The easement ran across the railroad tracks and led to the southern part of Brandt's land.

The railroad tracks were eventually sold to Lancaster County, which removed the tracks and created a hiking trail. Plaintiff, Spickler's estate, sought to enforce an easement over the railroad bed. We held that the plaintiff owned an easement "by operation of the Railroad Act of 1849," even though that Act was repealed when the case was decided. *Id*. at 923. That Act stated:

- 32 -

> Whenever, in the construction of such road or roads railroads, it shall be necessary to cross or intersect an established road or way, it shall be the duty of the ... said company [railroad company], so to construct the said road railroad across such established road or way, as not to impede the passage or transportation of persons or property along the same; and that, for the accommodation of all persons owning or possessing land through which the said railroad may pass, it shall be the duty of such company to make or cause to be made a good and sufficient causeway or causeways, whenever the same may be necessary to enable the occupant or occupants of said lands to cross and pass over the same.
> .

*Id*. at 924 (quoting 15 P.S. § 4101 (repealed)).

This Court concluded that the Railroad Act of 1849 accorded a landowner a "right to have an access way across the right-of-way/railroad when it divides the portion of land in two." ***Spickler***, ***supra*** at 924. The right was characterized as a vested interest created by the Railroad Act of 1849 that could not be extinguished by the Commonwealth or divested by the existence of a public road on the land where the road provided less convenient property access than a railroad crossing. The ***Spickler*** panel ruled that it is only "in those cases where a public route crossing the railroad right-of-way is in existence that a property owner cannot compel a railroad to furnish an additional private causeway crossing." *Id*. We continued that the vested property right to a private railroad crossing was originally owned by Brandt and that the property right was then conveyed by Brandt to the subsequent owners of the northern portion of Brandt's property.

The Railroad Act of 1849 was similar to the Act at issue herein. Specifically, § 18 of Act 96 provides:

> That for the accommodation of all persons owning or possessing land through which the said rail road may or shall pass, and to prevent inconveniences to such person in crossing or passing the same, it shall be the duty of the said company . . . to make . . . a good and sufficient causeway or causeways, wherever the same may be necessary, to enable the occupant or occupants of said lands, to cross or pass over or under the same with wagons, carts, and implements of husbandry as the occasion may require.

Section 18 continues, "Provided, That the said company shall in no case be required to make, or cause to be made, more than one such causeway through each plantation or lot of land, for the accommodation of any one person owning or possessing land through which the said rail road may or shall pass[.]"

Thus, Blackwood may have a vested property right under Act 96 to seek a single private crossing over the Tremont Extension. Act 96 provides that a cause of action arising under its provisions must be brought within six months; however, in **Spickler**, we construed a similar right created in a railroad act as a vested property right that was devised with the land, that could not be extinguished by the Commonwealth, and that was enforceable over 100 years after the railroad tracks in question were constructed. In light of this authority, Blackwood should be afforded the opportunity to litigate whether it is entitled to one private crossing.

The trial court herein also denied amendment based upon a finding that Appellee would have been prejudiced by the amendment since it was sought just before argument on the motion for summary judgment.[4]   In *Capobianchi v. BIC Corp.*, 666 A.2d 344 (Pa.Super. 1995), we noted that prejudice sufficient to deny amendment of the pleadings "must be more than a mere detriment to the other party[.]" *Id*. at 346.   Furthermore, the "fact that the adverse party has expended time and effort in preparing to try a case against the amending party is not such prejudice as to justify denying the amending party leave to amend[.]" *Id*. (citation omitted).   Indeed, "Denial of a petition to amend, based on nothing more than unreasonable delay, is an abuse of discretion." *Id*. at 347 (citation omitted).

In the instant matter, the trial court's finding of prejudice was premised upon the fact that amendment was sought just as the case was

_____

[4] Blue Mountain claims that the cause of action for a private railroad crossing is not a new one, as follows.   Blackwood knew about Blue Mountain's position that it owned the land and was provided a copy of Act 96 well before Blackwood sought amendment.   Blue Mountain suggests that, from its inception, this case really was about Blackwood's desire to seek private crossings.

The fifth amended complaint filed herein was to quiet title.   Blackwood's position was that Blue Mountain claimed to own but did not own the land under its tracks.   While Blackwood may have known of Blue Mountain's legal authority for its position that it did own the land under the tracks, the cause of action for a private crossing nevertheless is distinct from the cause of action claiming ownership of the property under the tracks.   The fact that Blackwood was aware of a potential cause of action for a private crossing before it sought amendment is not grounds for denying amendment.

going to be decided by summary judgment as to title to the property under the railroad tracks. Delay in seeking amendment, standing alone, does not warrant denial of amendment. Additionally, the amendment sought was unquestionably a new form of relief.

For the foregoing reasons, we affirm in part and reverse in part. Case remanded. Jurisdiction relinquished.

Judge Allen joins this memorandum.

Judge Donohue files a concurring and dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/28/2015